BAKER, Judge.
[1] Joshua Cruse appeals the protective order entered by the trial court preventing him from having contact with his ex-wife, C.C., except to communicate regarding their children. Cruse argues there is insufficient evidence supporting the protective order. We agree, and reverse.
[2] In June 2015, Cruse and C.C. were divorced. They have three children together. After several incidents involving verbal disagreements between the parents in front of or near the children, C.C. filed a petition for a protective order on June 18, 2015. She did not seek to prevent Cruse from having contact with the children, seeking only to limit the contact he was permitted to have with her. The trial court granted an ex parte protective order the same day. Following a November 24, 2015, hearing, the trial court reaffirmed the protective order, which prohibited Cruse from communicating with C.C. except on parenting time issues. Any communication regarding parenting time was ordered to be done in writing or through their parenting coordinator. Cruse now appeals.
[3] Initially, we note that C.C. has not filed an appellee’s brief. We need not develop an argument on her behalf, and may reverse if Cruse is able to establish prima facie error — error on the face of the order being appealed. Evans v. Thomas, 976 N.E.2d 125, 126 (Ind.Ct.App.2012).
[4] A person who has been a victim of “domestic or family violence” may file a petition for a protective order. Ind.Code *976 § 34-26-5-2. “Domestic or family violence” is defined as follows:
the occurrence of at least one (1) of the following acts committed by a family or household member:
(1) Attempting to cause, threatening to cause, or causing physical harm to another family or household member.
(2) Placing a family or household member in fear of physical harm.
(3) Causing a family or household member to involuntarily engage in sexual activity by force, threat of force, or duress.
(4) Beating (as described in IC 35-46-3 — 0.5(2)), torturing (as described in IC 35^6-3-0.5(5)), mutilating (as described in IC 35-46-3-0.5(3)), or killing a vertebrate animal without justification with the intent to threaten, intimidate, coerce, harass, or terrorize a family or household member.
For purposes of IC 34-26-5, domestic and family violence also includes stalking (as defined in IC 35-45-10-1) or a sex offense under IC 35-42-4, whether or not the stalking or sex offense is committed by a family or household member.
Ind.Code § 34-6-2-34.5. “Stalk” means “a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened.” . Ind.Code § 35-45-10-1. “Harassment” means “conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress.” I.C. § 35-45-10-2.
[5] In this case, C.C. testified as follows regarding her petition for a protective order:
• Cruse attended their son’s kindergarten graduation and told C.C. “he would make a scene right there in front of everyone.” Tr. p. 8. He followed C.C. “out into the parking lot telling the kids that ... I was keeping them from him.” Id. at 9. As a result, C.C. felt “intimidated.” Id.
• Another time, Cruse went to the school where C.C. works and the children go to school and “pulled [C.C.] out of my class room and said that he needed to talk to me then and there and made my boss feel uncomfortable with him being in there.” Id.
• More than once, he went to the school to have lunch with the children and stayed “for an extended amount of time” with the children after school employees asked him to leave. Id. He made “the kids’ teachers uncomfortable as well.” Id.
• On one occasion, Cruse attended their son’s baseball game. C.C. was there with a male colleague. C.C. overheard Cruse tell his uncle that she and the colleague “were probably banging[.]” Id. at 10. After the game, Cruse “[g]ot up in this gentleman’s face and told him that he better not come around our kids again and [the colleague] felt threatened enough that he left.” Id.
• In general, when Cruse “comes to events with the kids he tends to want to take them away from me, even whenever I tell him not to. And that is why I would prefer that he doesn’t come around ... I don’t feel that him taking them at a sporting event away *977 from me and he won’t listen to me, is appropriate.” Id.
There is no evidence that Cruse attempted to, threatened to, or did cause any acts of physical harm. There is no evidence that he placed C.C. in fear of physical harm.
[6] The dissent places great emphasis on the fact that Cruse was “holding a baseball bat” during the incident that occurred after the baseball game. Dissent para. 5. Indeed, the dissent states that, our “rationale insulates perpetrators of domestic violence from protective orders so long as those perpetrators are mindful to expressly threaten only friends or associates of former partners while in the presence of their former partners even while in the presence of their former partners or even while holding a potential weapon.” Id. at para. 10. We believe that this interpretation of our analysis goes several steps too far.
[7] When C.C. testified, she did not even mention the fact that Cruse was holding a baseball bat during this incident. Tr. p. 9-10. Instead, the only evidence she presented regarding this incident was that Cruse mentioned that C.C. and her companion “were probably banging” and that Cruse then “got up in this gentleman’s face and told him that he better not come around our kids again and he felt threatened enough that he left.” Id. at 10. Cruse’s testimony is the only evidence in the record regarding the bat during this incident. And he testified that, after his son’s game, he retrieved his son’s bat, which Cruse had purchased for him as a birthday present, so that they could later play baseball together. Id. at 16. Cruse acknowledged that he was carrying the bat when he argued with C.C. and her companion, but denied that he carried it in a threatening way, testifying that he “had it down by my knee the whole time. I never, ever moved it.” Id. at 17. Eventually, C.C. took the bat from him and looked like she was angry. Id. As the only evidence in the record regarding the bat establishes that Cruse was holding it in a non-threatening manner, and C.C. did not even mention the bat, we strongly disagree with the dissent that this suffices to establish that Cruse attempted or threatened to cause physical harm to anyone. We certainly do not believe that this holding in any way “insulates perpetrators of domestic violence.”
[8] The only possible basis for the protective order that remains, therefore, is a conclusion that Cruse’s actions constituted stalking. We find insufficient evidence that C.C. was actually terrorized, frightened, intimidated, or threatened. Although she did comment that at one point she felt intimidated, most of her concerns were based upon the way other people were reacting to Cruse. She was not frightened, she merely “preferred” that Cruse not be around when she was with the children. We also find insufficient evidence that Cruse’s course of conduct would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened.
[9] The judgment of the trial court is reversed.
VAIDIK, C.J., concurs.
NAJAM, J., dissents with separate opinion.